## GRACE v. LOUISVILLE & N. R. CO.

Middle Section. September 21, 1935.

Petition for Certiorari denied by Supreme Court, January 11, 1936.

Joseph Higgins and A. V. McLane, both of Nashville, C. C. Jackson, of Murfreesboro, and P. J. Anderson, of Gainesboro, for plaintiff in error.

Albert Stockell and J. E. Travis, both of Nashville, for defendant in error.

DeWITT, J.  The plaintiff was struck and injured by a truck owned by the Lassley-Bass Transfer Company and operated by its servant while the plaintiff was walking across Third Avenue South, in the city of Nashville.  This action was brought by him against the Louisville & Nashville Railroad Company for damages for negligence of the driver upon the theory that the Lassley-Bass Transfer Company was at the time of the accident acting as an agent of the railroad company and engaged as such in its business.  Upon the trial, at the close of the evidence offered by the plaintiff, the trial judge sustained the defendant's motion for peremptory instructions and dismissed the suit, upon the ground that the only conclusion to be drawn from the evidence was that the Lassley-Bass Transfer Company was an independent contractor.  The sole question here presented is whether or not this was error.

Seeking to enlarge its shipping facilities, the railroad company had inaugurated a system of receiving from or delivering to its shippers their outgoing and incoming freight at their places of business.  This is termed ''pick-up and delivery service.''  For this purpose the railroad company entered into contracts with all of the transfer companies in Nashville, whereby each was subject to call for such service during a week or other period exclusively of the others, during the year.  During the week in which plaintiff was hurt, the Lassley-Bass Transfer Company did all of the ''pick-up and delivery service'' for the railroad company when called upon and did no work for others, although at other times it was generally

engaged in a transfer business. The accident occurred while the truck was being driven, and occupied alone by a servant of its owner, for the purpose of obtaining goods from a shipper, to be carried to the railroad company's freight house, pursuant to a call from its freight clerk.

Under its contract the Lassley-Bass Transfer Company provided the servants and truck and operated it without direction, or provision for direction of operation, by the carrier. It collected the freight charges, gave receipts therefor, accounted for the moneys, and delivered to the carrier the freight bills and orders. It was an insurer of the freight while in its possession. It convenanted to protect, save harmless, and indemnify the carrier from and against all loss, damages, costs, and expenses that might be suffered by the carrier, or any other persons, or account of injury to or death of persons, loss or destruction of or damage or delay to property, caused by negligence of the transfer company's employees, in performing or failing to perform its duties under the contract, issuance of any fraudulent bills of lading or giving of false receipts by its agents, failure to make collections and remittances, theft, embezzlement, or defalcation on the part of the transfer company or its agents. The carrier was authorized to procure and keep in full force for the carrier's protection public liability and property damage insurance on all of the transfer company's vehicles used by it in transporting freight under the agreement; and also insurance for the carrier's protection against loss, damage, or delay of freight, or on account of issuance of any fraudulent bills of lading or receipts for freight—all premiums for such insurance to be paid by the transfer company by deductions from its compensation. For its services the compensation of the transfer company was fixed at $7\frac{1}{2}$ cents per one hundred pounds of freight handled by it to or from the carrier's depot. It was expressly stipulated that it was the intention of the parties that the transfer company would be and remain an independent contractor and that nothing therein contained should be construed inconsistently with that status; and that the transfer company would not display the name or any advertisement of the carrier upon any of its vehicles. The contract was to be in force for one year and thereafter until terminated by either party or thirty days' written notice to the other party; and the carrier reserved the right to terminate the contract for inability of the transfer company to procure the insurance or keep it in force, or for unsatisfactory service, or because of modification or abrogation of the contract by any order of a federal or state commission or decree of court, or for act of the transfer company in picking up or delivering freight for any carrier operating on any highway in competition with rail transportation service of carriers, or engaging itself in such transportation of freight in such competition.

The first contentions made in behalf of the plaintiff are: (a) That the railroad company merely extended its franchises and operations when it began the practice of gathering freight by sending to the premises of shippers; (b) that it was in the exercise of a power confided to it alone by the Legislature and nondelegable; (c) that it cannot escape responsibility for the acts of any instrumentality which it may use under its charter and legal privileges; (d) that it adopted this method of gathering freight and followed it for profit and by virtue of its corporate purposes and essentially as an extension of its granted right to act as a common carrier; and (e) that the truck driver was on a mission having a direct connection with the railroad company and was the agent through whom that company had chosen to augment its revenues. As the basis of these contentions, the rule is invoked that a public or quasi-public corporation cannot farm out its franchises. It is said by counsel: "Nor can it escape responsibility for injuries inflicted upon the public while contracting through an instrumentality that pro hac vice was a direct emanation from that corporation's right to pick up freight and to exercise its functions upon the streets of Nashville. The law will not tolerate the use of that convenient device known as an independent contractorship. Railroads are not permitted to carry on their corporate business in any way without that wholesome accompaniment of responsibility for damages inflicted by those agencies."

It is true that a railroad company cannot delegate the exercise of its franchise to individuals or others not authorized by law to carry on such business. Briggs v. Clawson Brothers, 8 Tenn. App., 251; State v. McMinnville & M. Railroad, 6 Lea, 369, 370; McMinnville & M. Railroad v. Huggins and Price, 3 Baxt., 177. This nondelegable privilege involves duties which the railroad company owes directly to its shippers and passengers, but do these duties extend to the public at large, so that the railroad company cannot contract with another for the extension of its service without liability to others than its patrons?

We have no doubt that the contract herein involved was within the power of the railroad company to make.

It did not provide for any extension of the line of its railroad but a mere service of transportation. Therefore it did not violate the prohibitions of the Interstate Commerce Act, sec. 1, par. 18, 49 U. S. C. A., sec. 1(18), against an extension of a line of railroad without a certificate of convenience and necessity from the Interstate Commerce Commission. This distinction is clearly demonstrated in the opinion of the United States Circuit Court of Appeals, Third Circuit, in New York Dock Railway v. Pa. R. Co., reported in 62 F. (2d), 1010. The service of "store door delivery and receipt of freight," as sometimes termed, is there prescribed as "accessorial terminal service." That case involved such service by trucks of

the railroad companies themselves, but the aforesaid distinction is apposite to the case before us. The contract in question was made by the carrier for extension of its service to shippers, and in order that it might meet the competition of motortrucks operating over the public highways. In New York Dock Ry. v. Pa. R. Co., supra, such service by a railway carrier with its own trucks was held to be within its power. It was consistent with its purposes and promotive of its authorized business. What the carrier could thus do with its own trucks it certainly could do with trucks of others engaged for that purpose. It is analogous to a contract made by a railway company with a sleeping car company for furnishing special accommodations to passengers. The principle applies to contracts for use of facilities in aid of transportation as distinguished from abandonment of charter rights and privileges. Pullman's Palace-Car Co. v. Mo. Pac. Railway Co., 115 U. S., 587, 6 S. Ct., 194, 29 L. Ed., 499 (as to power to contract with Pullman Company); Smith v. L. & N. R. R. Co., 131 Tenn., 531, 175 S. W., 557, L. R. A., 1916A, 1107 (as to power to contract with a stockyards company for deliveries of all stock at such company's yards); Express Cases (Memphis & L. R. R. Co. v. Southern Exp. Co.), 117 U. S., 1, 6 S. Ct., 542, 554, 29 L. Ed., 791 (as to power to contract with express companies). In the last-mentioned case it was said:

"So long as the public are served to their reasonable satisfaction, it is a matter of no importance who serves them. The railroad company performs its whole duty to the public at large and to each individual when it affords the public all reasonable express accommodations. If this is done the railroad company owes no duty to the public as to the particular agencies it shall select for that purpose. The public require the carriage, but the company may choose its own appropriate means of carriage, always provided they are such as to insure reasonable promptness and security."

We therefore conclude that the transfer company was not the attempted transferee of a franchise granted to the carrier; that it was not exercising some charter power or privilege of the railroad company which it could not have exercised independent of the charter; and the power to contract being sustained, it must now be determined whether or not the issue of liability of the defendant carrier should have been submitted to the jury. The contract must be construed to determine whether or not reasonable minds might differ as to the relation which it created. It is familiar law that an "independent contractor" is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to control of his employer, except as to the result of his work. The ultimate question is not whether the employer actually exercises control, but whether he has the right

to the control of essential details. Gulf Refining Co. v. Huffman & Weakley, 155 Tenn., 580, 297 S. W., 199; Powell v. Construction Co., 88 Tenn., 692, 13 S. W., 691, 17 Am. St. Rep., 925; Mayberry v. Bon Air Chemical Co., 160 Tenn., 459, 26 S. W. (2d), 148; Morgan Lumber Co. v. James, 14 Tenn. App., 305. Merely denominating one an "independent contractor" does not make him so. Chunn v. Memphis Flooring Co., 7 Tenn. Civ. App., 532. In every case the decisive question is: Had the defendant the right to control in the given particular the conduct of the person doing the wrong? Phillips v. Tenn. Eastman Corp., 160 Tenn., 538, 26 S. W. (2d), 1051; Powell v. Construction Co., supra.

In Standard Oil Co. v. Parkinson (Circuit Court of Appeals, Eighth Circuit) 152 F., 681, 682, the rule was more elaborately stated as follows:

"The test of one's liability for the act or omission of his alleged servant is his right and power to direct and control his imputed agent in the performance of the causal act or omission at the very instant of the act or neglect. There can be no recovery of a person for the act or omission of his alleged servant under the maxim, 'respondeat superior,' in the absence of the right and power in the former to command or direct the latter in the performance of the act or omission charged, because in such a case there is no superior to respond. Brady v. Chicago & Great Western R. Co., 114 F., 100, 107, 52 C. C. A., 48, 55, 57 L. R. A., 712; Atwood v. Railway Co. (C. C.), 72 F., 447, 454, 455; Byrne v. Railroad Co., 61 F., 605, 608, 9 C. C. A., 666, 24 L. R. A., 693; Hilsdorf v. City of St. Louis, 45 Mo., 94, 98, 100 Am. Dec., 352; Town of Pawlet v. Rutland & W. R. Co., 28 Vt., 297, 300; Miller v. Railroad Co., 76 Iowa, 655, 659, 39 N. W., 188, 14 Am. St. Rep., 258; Wood. R. R., sec. 388; Donovan v. Construction Syndicate (1893), 1 Q. B. Div., 629; Rourke v. Colliery Co., 2 C. P. Div., 205."

All these rules are guides to the proper conclusion from the contract and the situation and conduct of the parties.

In Gulf Refining Co. v. Huffman & Weakley, supra, the question whether or not a party to a contract for handling of gasoline and oils was an independent contractor was held to be a mixed question of law and fact, so that the issue of liability of the furnisher of these materials for negligence of the other party was treated as properly submitted to the jury. This was likewise held, upon the authority of that decision, in Texas Company v. Ingram, 16 Tenn. App., 267, 64 S. W. (2d), 208, the contracts and dealings between the parties being substantially alike. In each case the contract and the transactions thereunder showed a reservation of the right of control of essential details—the use of equipment free from unsafe defects, the use of prudent and responsible employees in the handling of high explosives, and the manner of deliveries of them. The local

party was held out and generally recognized as the agent or representative of the refining company, which even retained title to the gasoline and oils until sold on commission by the other party. In each of those cases it was held that there was evidence from which the jury could conclude that the refining company was the principal and the other party its agent instead of independent contractor. At last, the court construed the contract and found that the jury's construction was sustained by evidence.

In the instant case the evidence shows without dispute that the transfer company was, at the time of the accident, engaged in performing its contractual obligations to the carrier. Aside from the contract there are no material facts other than those heretofore recited. If there was a right of control, it must be found in the contract. If it did not constitute the transfer company an employee of the railroad company, the transfer company must be treated as an independent contractor with reference to the plaintiff.

As to freedom from the control of the employer as respects the manner in which the details of the work are to be executed, the following statement of the law, quoted in the opinion in Odom v. Sanford & Treadway, 156 Tenn., 202, 299 S. W., 1045, is found in 14 R. C. L., pp. 68, 69:

" 'As a practical proposition, every contract for work to be done reserves to the employer a certain degree of control,—at least to enable him to see that the contract is performed according to the specifications. The employer may exercise a limited control over the work without rendering the employee a mere servant, for the relation of master and servant is not inferable from the reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative so long as he does it in accordance with the contract. The control of the work reserved in the employer which makes the employee a mere servant is a control, not only of the result of the work, but also of the means and manner of the performance thereof; where the employee represents the will of the employer as to the result of the work but not as to the means or manner of accomplishment, he is an independent contractor. Thus a person employed to perform certain work is not necessarily a mere servant because the contract provides that the work shall be subject to the approval or satisfaction of the employer. Such a provision is not an assumption by the employer of the right to control the employee as to the details or methods of doing the work, but is only that the employer may see that the contract is carried out according to the plans.' "

The contract sets forth the whole plan of service, with many details; but the details are of results accruing to the carrier and not details of operation to accomplish those results. There was no reservation of right to tell the transfer company what kind of trucks to use

or what servants to employ, or the size of a load, or how to box and crate the freight, or what streets to travel—only at last getting and delivering the freight to or from the carrier's depot, collecting the freight charges, and accounting for them. All the rest was left with the transfer company and under its control. Necessarily the service was to be performed when needed by the carrier; but it is not essential to the status of an independent contractor that he be in actual service at all hours. The test is his status when he is in service under the contract.

The question is not controlled by the mere fact that the compensation was paid by the piece or job. Phillips v. Tennessee Eastman Corp., supra. That case involved claim for compensation for the death of a man from the falling of a tree while engaged in performance of a contract in writing, by the terms of which he undertook to cut and pile a given number of cords of chemical wood, within a stipulated distance from the railroad for a consideration of a certain sum a cord. Specifications covering sizes, lengths, nature, and quality of the wood, and the manner of piling were set forth in the written contract in detail. It was provided that the work was to be started and completed within a certain period; that the deceased was to keep employed an average of not less than two men until the work should be completed; and that the cutting was to be done upon a certain tract of land described in the contract. The court held that the deceased was an independent contractor; that there was no reservation of the right to control the conduct of the deceased with respect to the manner in which he and his helpers should exercise force or skill in felling the trees, or what precaution he should take for his or his helper's safety; that as to such details or particulars, the Eastman Corporation neither reserved nor undertook to exercise control, for it was interested only in the results of the cutting and the limitation of the operations to that timber which it had acquired the right and had the desire to cut. In principle that case is quite analogous to the case before us.

The case of Frost v. Blue Ridge Timber Corp., 158 Tenn., 18, 19, 11 S. W. (2d), 860, another compensation case, is not so analogous, as is contended here by counsel, for there was evidence that the superintendent of the employer could control the means and method of performance of the contract for hauling lumber, and there was no evidence of relinquishment of the right to control such means and methods.

Finley v. Keisling, 151 Tenn., 464, 270 S. W., 629, is in line with the Frost Case because the employer generally had the right to direct and supervise the work of the employee in cutting and hauling timber. Each case involving this question must depend on its own facts, since ordinarily no one feature of the relation is determinative, but all must be considered together.

In Odom v. Sanford & Treadway, 156 Tenn., 202, 299 S. W., 1045, the distinction is clearly pointed out between the exercise of control over the means and method by which the contractor performed the work, and the exercise of direction and control as to results without destroying the independency of the contract. That was another compensation case in which the complainant was found not to have been an employee because there was no right of control over the means and methods to be used in cutting and hauling of timber.

In Siskin v. Johnson, 151 Tenn., 93, 268 S. W., 630, it was held that one who had contracted to unload wheels at so much per car, and whose employer exercised no control over him, was an independent contractor.

The reservations in the contract of the power to terminate it for any of the reasons therein stated do not control. Odom v. Sanford & Treadway, supra; Louisville & N. Railroad Co. v. Cheatham, 118 Tenn., 160, 100 S. W., 902. A good reason for the application of this rule in this case lies in the fact that this was not a contract for a series of services culminating in a finished whole, like the erection of a building, but a series of services separate from each other, each transfer and delivery to be complete in itself. There is no reason why under such circumstances the right to terminate the contract for any of the reasons specified should change the status from that of independent contractor.

The provisions for carrying insurance will not alone, as is conceded by counsel, convert a contract into one of master and servant. We refer particularly to the provision for liability insurance. Certainly no point can properly be made in any view because of the requirement of insurance against the consequences of failure to collect and account for freight charges or against loss from theft or fraud.

We do not construe the requirement of liability insurance to protect the carrier as an admission that it might be liable in such case as this. It was evidently made out of abundant caution. It is true that there are many cases holding that evidence is admissible, as to such an issue, that the alleged employer carried indemnity insurance; but only as having a tendency to negative the independence of the contract, when there was other evidence tending to show the relation of master and servant. See Nissen Transfer & Storage Co. v. Miller, 72 Ind. App., 261, 125 N. E., 652. Annotations upon this subject appear in 85 A. L. R., page 784 et seq.

The contention that the contract was invalid because in restraint of trade is not sustainable. If the provisions against entering into competition with the carrier were invalid, it would not affect this question of right of control of the means and methods of performing the service for which the contract was entered into. Such provision for restraint from engaging in competitive business had no relation to the performance of such service.

It is of course true that the liability of a carrier for goods commences when the goods are delivered to him or his authorized agent for transportation, and are accepted. Pratt v. Grand Trunk Railroad, 95 U. S., 43, 24 L. Ed., 336. A railroad company is liable to its patrons for nonperformance of the duties which are incident to the discharge of its functions as a common carrier. The duty of such carrier is a nondelegable duty running to the shipper, as to which the carrier cannot contract so as to relieve itself of liability. This was evidently the reason why the carrier required the transfer company to indemnify it from all loss and damage, securing the same with insurance. It is the public duty that the carrier owes to the shipping public and to its passengers that is a nondelegable duty. In the case before us the plaintiff was neither a passenger nor a shipper and the defendant did not owe him any public duty in the circumstances of the accident. This principle was applied in the very analogous case of L. & N. Railroad Co. v. Marlin, 135 Tenn., 435, 186 S. W., 595, L. R. A., 1917A, 417, an action against the railroad company for the tort of the conductor of the Pullman Company in wantonly compelling a trespasser to jump off while the train was passing over a high trestle. The Pullman Company, a contractor with the railroad company for furnishing special accommodations to passengers, hired its own conductor, who committed the wrongful act. Admitting that as affecting passengers the porter and conductor in charge of a sleeping car are deemed the agents of the railway company of whose train the sleeping car forms a part, and therefore responsibility for their acts is imposed upon the railway company, nevertheless the law would not impute to the employees of the Pullman Company an agency for the railway company as respects trespassers, or the relation of master and servant between them in respect of the conduct of such employees toward such trespassers. As to trespassers there is no contract and no duty of service, and public policy does not imply the imputation of an agency. Therefore the act of the employee of the Pullman Company could not be deemed to be the act of the railway company under the rule of respondeat superior. This ruling is clearly applicable to the case before us, for the driver of the truck was in a status analogous to the conductor of the Pullman car. The duty which he owed to the public to use proper care to avoid injuring any one was aside from and beyond the duty which the railroad company owed to its shippers when their freight was in the hands of the transfer company.

The contract being plain and unambiguous, the service thereunder being not inherently dangerous, the trial judge was not in error in refusing to submit to the jury the issue of liability of the railroad company, holding that the transfer company was an independent contractor for the negligent act of whose servant, under well-settled law, the railroad company would not be liable. The assignments of

error are overruled and the judgment of the circuit court dismissing the action is affirmed. The costs of the appeal in error will be adjudged against the plaintiff in error.

Faw, P. J., and Crownover, J., concur.